### LLOYD v. COCHRAN. (No. 954.) *

(Court of Civil Appeals of Texas. Beaumont. Nov. 23, 1923. Rehearing Denied Dec. 12, 1923.)

**1. Partnership ⬤⟲258(7)—No cause of action stated in petition for balance due from deceased partner.**

In suit by a partner against administratrix of deceased partner for balance claimed under one phase of the partnership agreement, where there was no prayer for accounting and no showing of insolvency, nor explanation of certain charges against the deceased partner, petition *held* not to state a cause of action.

**2. Partnership ⬤⟲258(8½)—Instructed verdict in action against deceased partner's administratrix not authorized under evidence.**

In suit by partner against administratrix of his deceased partner for amount appropriated in excess of share of profits, where the auditor's report showed arbitrary charges under instructions of plaintiff, charges for outstanding accounts, with no showing as to their solvency, or whether collected since dissolution, and there was no proof as to agreement to share office expense, part of which was charged to deceased, and proof showed that the business was developed by deceased and appropriated by plaintiff, an instructed verdict for plaintiff *held* not authorized.

**3. Partnership ⬤⟲258(8)—Partner's bond to pay any sum due improperly admitted.**

In suit by a partner for a balance due from a deceased partner, where a bond executed by the latter to pay any sum due growing out of the partnership affairs did not admit liability, its admission in evidence was error.

**4. Evidence ⬤⟲174(2)—Admitting evidence of exhibits taken from books held error.**

In suit by a partner for an alleged balance due from a deceased partner, it was error to admit exhibits attached to petition and taken from the original books, when the books were not before the court, and defendant had made demand for them.

Appeal from District Court, Harris County; W. E. Mantooth, Judge.

Action by J. B. Cochran against Mrs. Ethel Pearce Lloyd, administratrix. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

H. E. Stephenson, of Houston, for appellant.

Mathis, Teague & Mathis and Stevens & Stevens, all of Houston, for appellee.

---

⬤⟲For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error dismissed for want of jurisdiction February 13, 1924.

WALKER, J. In his petition against appellant, appellee alleged: That appellant was the duly qualified and acting administratrix of the estate of her deceased husband, Herman F. Lloyd. That on or about the 1st day of March, 1916, he and Lloyd "associated themselves together as partners for the purpose of doing a casualty insurance business in the city of Houston, Harris county, Tex. That, as such partners, plaintiff and the said Herman F. Lloyd carried on and conducted a casualty insurance business in said city until on or about the 30th day of April, 1918, when said partnership was dissolved by mutual consent. At the time of the forming of said copartnership, the plaintiff was engaged in the business of writing casualty and fire insurance and surety bonds, and on said date the said Herman F. Lloyd was admitted by plaintiff as a partner in said business in the casualty department only, upon the agreement and understanding between this plaintiff and the said Herman F. Lloyd that they should and would share equally the net profits made and earned in the casualty department of said insurance business. It was also understood between plaintiff and said Herman F. Lloyd, as a part of such partnership agreement, that said Herman F. Lloyd should have what they termed a 'drawing account' of $200 per month—that is, he was entitled under their agreement to draw the sum of $200 a month from the earnings of said business, the amount so drawn by him to be charged against his share of such earnings." That "there were net profits earned and collected in the casualty deparement of said business the sum of $6,747.57." That during the life of the partnership Lloyd withdrew, on his drawing account, $5,000, and appropriated other accounts, to the amount of $152,000. That the share of said Lloyd in the net profits of said business was the sum of $3,373.77, and appellee sued to recover against the administratrix of Lloyd's estate the difference between his half of the net profits and the aforesaid sum withdrawn by him. Appellee also prayed for general and special relief. He attached to his petition what he represented and pleaded as an itemized statement of the business of the partnership. It appears from this statement that appellee charged the partnership with $1,560 for postage, office rent, clerical force, and rent excess. This item is not explained by pleading. It is not charged that the items were agreed to by Herman F. Lloyd, nor that it was a part of the partnership contract that he should pay one-half of that sum, nor that the items were just and reasonable, yet in the itemized statement Lloyd is charged with one-half of this sum. Again, appellee charges the partnership with certain uncollected accounts, amounting to the sum of about $1,324.34. No explanation is made by appellee in his petition of these items, nor of the present status thereof, nor of the solvency of the claims, nor why they were charged against the account of Herman F. Lloyd.

Appellant answered by general demurrer and general denial. During the pendency of the suit, on motion of appellee, the trial court appointed an auditor, who, under order of the court, examined the books and accounts of the partnership, and made a report showing a balance due by Herman F. Lloyd to appellee in the sum of $1,426.42. This report was duly excepted to by appellant, and, in addition to offering this auditor's report in evidence, appellee offered the testimony of one of his attorneys, to the effect that this claim against Lloyd was lodged with him for suit prior to Lloyd's death, and also the testimony of his bookkeeper, J. P. Demerit, who testified:

"I knew Herman F. Lloyd in his lifetime. I worked for Mr. Cochran at the time Mr. Lloyd was connected with him. Mr. Lloyd came into the firm in the early part of 1916, I think—somewhere along there. The name of the firm was Cochran Insurance Agency. I do not know of any written contract between Mr. Cochran and Mr. Lloyd. There was an agreement between Mr. Cochran and Herman F. Lloyd in their partnership matters. I will have to answer your question as to what was that agreement in this way: That I was not present when Mr. Cochran and Mr. Lloyd entered into that agreement. Mr. Lloyd talked to me with reference to that contract. Mr. Lloyd told me that he had entered into a contract with Mr. Cochran to handle the casualty end of his insurance business; that they had entered into a partnership arrangement. * * * There has never been an accounting between them in reference to the partnership business and dissolution that I know of. * * * Mr. Lloyd said that he had entered into this partnership with Mr. Cochran to handle the casualty end of the business and that it was to be operated on this basis: That they would divide the profits derived from that business on a fifty-fifty basis, after paying all operating expenses. He said that he had a drawing account of $200 a month, that was to be charged to his account. I have made out a statement to Mr. Lloyd. Mr. Lloyd wanted to know what the casualty department had been doing up to that time, and we got up a statement of commissions and expenses, to show what money had been made by the department during the first six monhs of its operation. Up to the time of this six months, my books were kept altogether with the firm's regular accounts. They were never segregated. I don't recall anything that Mr. Lloyd said at that time with reference to this statement that I got up. After that time I opened a separate ledger for the casualty end of the business, simply for my own convenience, but the balance of the details were handled in the same way that they had been theretofore; there was no separate bank account. The accounts receivable and the accounts payable were segregated from the fire end of it from that time on. * * *. I was in Mr. Cochran's employ at the time the dissolution was made. * * * I remember when Mr. Lloyd died. * * * Before his death, I, as bookkeeper

for that partnership and Mr. Cochran, presented him with an account as to what he owed. That is the same account that I presented to him prior to his death. I went over it with him. He did not deny it. I was acting for Mr. Cochran at that time. This account was made out by me from my books, and was presented to him prior to his death, and he did not deny it. He requested me to get up that account for him. * * * As soon as the statement was completed, I showed it to him, and there was only one objection that he raised to the statement at all, and that was with reference to some expense matters. I can't recall from this the different itms of expense which he objected to, but there were some items in the expense that we charged to the casualty department that he stated he thought should not have been charged to that department. I do not know how much they were—how much they amounted to. * * * I kept all these books; that is, with reference to the entire insurance business. The insurance business of Mr. Cochran at that time consisted of fire insurance business largely and principally. * * * It was just before the partnership was dissolved that I presented him this account, and right after that he went in business for himself. * * * At the time Mr. Lloyd went in there, the Cochran Insurance Agency was not doing a casualty business. * * * I do not mean to say that I kept a separate and distinct account, so as to show the exact cost of running the casualty business. I segregated those items merely for my own convenience, so I could determine what volume of business the casualty department was doing. * * * You do value the casualty business on the premiums it takes in during the year, in insurance business. The value, or the market price, or the salable market price, is determined on the amount of incoming and outgoing premiums. * * * The statement which I prepared did not show what proportion of the rent was charged to the casualty business. * * * There were no books kept to show what rent was charged to the casualty department. * * * There were telephone expense items and other expense items which I charged to the casualty department from stubs in Mr. Cochran's check book. I posted from those stubs. Mr. Cochran would pay the bills on the 1st of every month, and he would indicate on the stub whether it was to be charged to the fire or the casualty department, and such items that were chargeable to the casualty department, I charged them up from that information. That would be from what Mr. Cochran told me about it, or what I found from his stubs. There was no separate bank account kept by the casualty department. That was all kept in Mr. Cochran's own name. We used quite a few stamps. There was no separate account kept for the casualty department. With reference to the office assistants and general expense there, a separate account was kept in reference to the casualty department for only one item; that was the stenographer that was employed by Mr. Lloyd. That was charged to the casualty department. The balance was arrived at after this statement had been gotten up; not before he saw that statement there. I took this statement, showed it to Mr. Lloyd, and he then had

a discussion with Mr. Cochran. I don't know what that was; I was not present; and Mr. Cochran added to this statement the expense items; that is, $50 a month for general overhead expense, which was intended to include the casualty department's proportion of the bookkeeping, of the collector's hire, and other operating expenses—just made a flat charge of $50 a month. I afterwards showed the statement to Mr. Lloyd, and he said, 'That seems to be fair.' That was the only comment that he made. I don't know whether Mr. Lloyd accepted that statement or rejected it. I know that he stated that the statement seemed to be all right, with the exception of certain expense items that he thought should not have been charged to the casualty department. He handled that casualty department and worked it up, made it what it was. I charged him with that $200 a month. I did not charge any of that to the other business; that is, to the fire insurance business. He was not satisfied with that; that constituted one of the largest items on there. He did not enumerate any other specific items; he said there were certain expense items that he thought should not have been charged to that department. I could not state to the jury that when I showed him that account there was not any objection made, not except as I have outlined. * * * I know that at that time Mr. Cochran was charging items to Mr. Lloyd, and that they had a difference there, and that they could not settle it. That was before Lloyd died. * * * The expense items on this account were the bone of contention. Mr. Lloyd and Mr. Cochran could not agree on it. They never did agree, so far as I know. Mr. Lloyd went out of the business, and that ended the partnership so far as I know. As to how long the partnership was to exist, and what each one was to get as to the profits, I do not know. I wasn't there when it was entered into. Mr. Lloyd was to build up the casualty department, as I understood it. * * * There never was a trial balance made of those books at all, that I know of. * * * I do not know whether Mr. Cochran has collected that bunch of items here, aggregating $1,390.35, charged to the casualty department and being claimed against various parties. This net summary here, showing a profit of $9,697.92, does not take into consideration any salary for Mr. Lloyd. In other words, what he drew was charged to him and taken out of his share of the profits. During the time he was there, he did the business that was done, built up most of the casualty department. * * * I do not mean to tell the jury that he (Lloyd) admitted he owed that money there that was set forth in that account. He did not admit that to me. Herman and I were good friends. I did not take that bill to him and ask him to pay that. I got it up for him, and turned it over to him. The controversies that arose later did not cover nearly every item in there pro and con, first one way and another, that I know of. With reference to whether or not I know that it took a week or ten days and several conferences to figure on this thing pro and con, about the correctness of the charges made to the casualty department, including that $200 drawing account, well, he objected to the charges that were made to the account; he objected to

some expense items and some of the uncollected accounts. Those were his personal objections. He mentioned something about that drawing account being charged to him later, but he did not mention anything about the drawing account at the time I gave him the statement. * * * As to what part of the expense incurred by the casualty department in the whole Cochran's Insurance Agency during the first six months of that business, I could not tell."

On conclusion of the evidence, a verdict was instructed in favor of appellee against appellant in the sum of $1,426.42, the amount due appellee by Herman F. Lloyd, as shown by the auditor's report.

### Opinion.

[1] The trial court erred in overruling appellant's general demurrer to appellee's petition. Appellee was not praying for a final accounting on the partnership matters between himself and Herman F. Lloyd, but was suing for a balance which he claimed to be due under one phase of the partnership agreement, as pleaded by him. There is no showing as to the insolvency of the partnership, as to claims due by it. He made no explanation of the outstanding accounts which were in his hands. Again, the inclusion of special items of expense in the exhibit, without an explanation in the petition, did not give appellee a cause of action therefor. He alleged no special agreement to pay office rent, postage stamps, and clerical items. There is no allegation that these expense items were included in the partnership agreement, nor that they were proper and just and reasonable charges.

[2] But, if the petition were sufficient, the evidence does not sustain an instructed verdict. It is clear from the record that the auditor's report was made up from the books, kept by Demerit under instructions from J. B. Cochran. The auditor's report shows that Lloyd was charged with the sum of $780, which the auditor explained as an "arbitrary charge as per Cochran's statement to Lloyd's account." Again, the auditor's report charges Lloyd's account with $662.17, which was explained as being one-half of the outstanding accounts; no explanation being made as to the solvency of said accounts, nor as to whether they have been collected subsequent to the dissolution of the partnership. Proof was not offered that Lloyd had agreed to pay any portion of the expense, nor that they were included in the partnership agreement; but it clearly appears from appellee's witness, Demerit, that a misunderstanding existed between Cochran and Lloyd as to the liability of the partnership for certain of these expense items. It also appears from Demerit's testimony that Cochran had nothing to do with the casualty end of the business, except to furnish office space and to keep the money; but it clearly appears that

Lloyd developed the business himself, and that at the time of the dissolution of the partnership, on the basis of Demerit's testimony, this line of Cochran's insurance agency had a market value of possibly $12,000. The issue was raised by the testimony that Cochran appropriated this asset to himself. The issue is also raised by Demerit's testimony that Cochran and Lloyd disagreed as to the charge against Lloyd's one-half of the $200 per month drawing account. However, in view of the state of the pleadings in this case, it is not necessary for us to determine whether an issue was made that this $200 per month was to be paid to Lloyd out of the partnership assets, as a partnership compensation to him for his services in managing the business.

[3] On dissolution of the partnership between Lloyd and Cochran, it appears that Lloyd executed to Cochran a bond, obligating himself to pay Cochran any sum that he might be due him growing out of the partnership affairs. The court erred in admitting this bond in evidence over appellant's objection. It contained no admission of liability, and had no probative force on any issue before the jury.

[4] The court erred in admitting in evidence the exhibits attached to appellee's petition. It appeared that these exhibits were taken by the witness Demerit from the original books, which were not before the court, though appellant had made demand therefor.

For the reasons given, the judgment of the trial court is reversed, and this cause remanded for a new trial.